DOTY and others *v.* LAWSON, Jr., and others, Adm'rs, etc.

*(Circuit Court, E. D. Wisconsin.)*

1. COUNTER-CLAIM—BREACH OF COVENANT—ACCEPTANCE OF CONTRACT WITH KNOWLEDGE OF COVENANTEE.

A party who purchases property by an instrument of sale under seal, in which it is covenanted that a corporation from whom the seller acquired the property should fulfill its certain covenant in regard to the construction of a canal as therein specified, cannot, in an action for the unpaid installments of the purchase money, set up as a counter-claim the failure of such corporation to construct the canal according to specification, if such canal had been accepted by the seller, previous to the time of entering into the contract of sale, with the full knowledge of the purchaser.

2. SAME—ACT OF UNITED STATES.

The erection by the United States of a dam injuriously affecting a water-power conveyed by an instrument in which it is covenanted that the corporation from whom the seller acquired the property " should not construct, or allow to be constructed, a dam or other improvement " below such water-

power to its injury, is not a breach of such covenant, the land having been bought at a foreclosure sale, and subsequently conveyed to the government, and can not be set up as a counter-claim in an action for unpaid installments of the purchase money due under the instrument of sale aforesaid.

This was an action brought on a contract for the installments due on the purchase money of a water-power, so called, formed by the construction of a dam at the foot of Lake Winnebago, by means of which the water was forced through a canal, in the city of Menasha, about a mile in length, and given a fall of seven to nine feet. The defendants set up counter-claims, and the only questions involved related to their validity and effect. The plaintiffs, in 1875, sold to the intestate, Publius V. Lawson, an undivided half of the water-power, by an instrument under seal, whereby, among other things, the plaintiff covenanted with the defendant that the Fox & Wisconsin Improvement Company (a Wisconsin corporation chartered in the year 1853) should fulfill its certain covenants with Charles Doty and Harrison Reed and Curtis Reed, contained in a contract bearing date July 24, 1855, by which contract the improvement company, for a valuable consideration, sold to the other parties thereto the hydraulic power arising from the dam aforesaid, and the canal, which was then in an unfinished condition. And the improvement company covenanted, among other things, that it "would proceed to finish and build the said canal, and lock appertaining thereto, and that the said canal should be 100 feet wide at the bottom." The improvement company further covenanted in the same instrument that it "would not construct or allow to be constructed any dam or other work below, on the said river, which should raise the water above the ordinary stage at the foot of the rapids at Menasha, aforesaid."

The breaches assigned in the present action were—*First*, that the Fox & Wisconsin Improvement Company did not proceed to finish the said canal, and make the same 100 feet wide at the bottom, whereby the said hydraulic power and property so conveyed were less valuable than they would have been if the agreement had been fulfilled, by the amount of $3,000; *second*, that it did construct, and had allowed to be constructed and maintained, a dam at the head of Grand chute, at the city of Appleton, Wisconsin, which has raised the water above the ordinary stage at the foot of the rapids at Menasha about two feet, and thereby reduced the head of water at the said canal, and has injured the value of said hydraulic power; for which damages to the amount of $6,000 were claimed.

The said Doty, Reed & Reed, covenantees of the improvement company, conveyed, previous to the year 1875, one undivided half of the hydraulic power so transferred to them, to the plaintiffs in this action. The reply alleged that the covenant of the improvement company in regard to finishing the canal and lock was to the effect that it should be done by the sixth day of July, 1856, a date long prior to the execution of the contract declared upon in this action; and also that the improvement company had performed that covenant to the satisfaction of the covenantees therein named, who had received and accepted the work as completed within the time fixed therefor, and as full performance and satisfaction of the covenant for construction; of all which Lawson had notice at the date of entering into the contract with the plaintiffs. The plaintiffs denied that the intestate had sustained any damages on account of alleged non-performance of the covenant in question. And in regard to the allegation respecting the dam, the plaintiffs denied that the improvement company had constructed, or allowed to be constructed and maintained, a dam at the head of Grand chute, in the city of Appleton, as alleged in the counter-claim. And they denied that the intestate had sustained any damage on account of the construction of any dam.

The testimony showed that the improvement company, in 1855, claimed to be the owner of the hydraulic power, and desiring to purchase land owned by Doty and the Reeds, had made with them the agreement set out in the pleadings; that the canal was then in process of construction by the improvement company, and within the time fixed in the agreemeet the improvement company had constructed the canal to the satisfaction of Doty and the Reeds, and delivered the same to them; and both parties to the agreement had since then treated the same as fully performed in that respect, although in fact the improvement company had constructed the lower part of the canal only about 60 feet in width at the bottom, and not 100 feet, as agreed. There were other covenants in the same contract made by the improvement company, no breach of which was claimed to have been committed.

It appeared, also, that soon after the making and recording of the contract with Doty and the Reeds, and the delivery to them of the water-power and property conveyed by the instrument of 1855, the improvement company made, under date December 1, 1856, a deed of trust to a trustee as security for money borrowed by the company, in which deed of trust no exception or reservation was made by the

improvement company in respect to the construction of the dam below the Menasha water-power. Foreclosure was afterwards had under the deed of trust, and the whole property thereby conveyed was bid off to an agent, who soon afterwards transferred it to the Green Bay & Mississippi Canal Company. That company, after holding the property a few years and proceeding with the improvement, conveyed the whole of it, excepting the hydraulic water-power, to the United States, which purchased the same pursuant to the terms of an act of congress approved July 7, 1870. 16 St. at Large, 189.

The United States government had, before any of the proceedings mentioned, conveyed to the state of Wisconsin certain lands to be used by the state for the purpose of improving the navigation of the Fox and Wisconsin rivers, situated within that state, and the improvement company had been incorporated for the purpose of carrying on the work of improvement. The Green Bay & Mississippi Canal Company were engaged also in prosecuting the work after becoming the owners of the lands and other property, which the Fox & Wisconsin Improvement Company had previously held, and by the terms of the act of congress named, the government received the canals, locks, and certain other property of the Green Bay & Mississippi Canal Company, and proceeded with the work of improving the navigation of the two rivers. Before the date of the first contract, in 1855, the improvement company had already constructed a dam at Appleton, which remained continuously until superseded by the new dam built of masonry by the United States, which will be presently mentioned. But that dam, owing to the imperfect character of its construction, allowed large quantities of water to pass through, so that the navigation was imperfect, and no water was backed up by it upon the rapids at Menasha. The dam had fallen so much out of repair that when the United States assumed the work of improving the navigation, it proceeded to construct, and did construct, in 1873 and 1874, a new dam upon the site of this former dam, and of the same average height as the former dam, but so much better built that it produced, according to the testimony of the defendants' witnesses, a distinct rise of water above the height previously maintained, and did by several inches or a foot reduce the height of the head of water at Menasha. And it was for the injury thus sustained that the defendants sought to recover in the second counter-claim.

The amount of rise of water, the causes to which it was due, and amount of injury, if any, sustained by Lawson on account of it, were

controverted by evidence on the part of the plaintiffs. The plaintiffs also proved that the hydraulic power sold to Doty and the Reeds had been in their possession and in that of their grantees from the year 1856 down to the present time; that the intestate, Lawson, had been in possession of the same, and of the rents and profits thereof, after his purchase in the year 1875 until the time of his death, since the beginning of this action; that Lawson himself had been one of the lessees of a portion of the water-power before his purchase; had been a resident of Menasha, and had been well acquainted with the situation of the water-power and adjacent property for many years previous to his purchase; that no demand had been made upon the improvement company, either to enlarge the canal or to abate the dam which it had constructed, as above mentioned, nor had the improvement company in any manner consented, unless by its deed of trust above mentioned, to the construction or rebuilding of the dam on the part of the United States. The improvement company, in fact, had ceased to do any corporate act, and had become practically extinct, about the time of the sale of its property under the foreclosure above mentioned, in the year 1866.

At the conclusion of the evidence the plaintiffs moved for an instruction to the jury that the evidence did not show a valid counter-claim, and that the court should instruct the jury to render a verdict for the plaintiffs, disregarding the counter-claims.

In support of this motion it was contended by *Winfield Smith*, counsel for the plaintiff,—*First*, that the improvement company, having transferred the possession of the canal to Doty and the Reeds, and they having accepted the same as completely performed according to the covenant, and retained the same for nearly 20 years previous to the sale by the plaintiffs to Lawson, and Lawson being fully acquainted with the facts and the then situation of the canal, it must be held that Lawson purchased the property in the same condition in which it had so long existed, and did not acquire any right of action against the improvement company on account of not having completed the canal as required in the original contract; that the claim of Doty and the Reeds against the improvement company must be taken to be waived by the acceptance of the work, and the long failure to make any demand against the improvement company; and the covenant of Doty, made upon the sale to Lawson, must be construed as relating to such obligations as the improvement company was yet bound to perform; that in view of the facts it could not

be supposed that Doty and Lawson referred in their agreement to the former covenant respecting the size of the canal, which was treated by all parties as completely performed.

As to the dam, of which the defendants complained, it had been constructed by the United States a year or two *before* the sale by Doty to Lawson, and the existence of it was then as well known to Lawson as to Doty. Counsel argued that the covenant of Doty was in its terms and meaning prospective, and was not retrospective; that it did not relate to acts *previously* done or suffered by the improvement company, but must be construed to embrace only acts thereafter performed; that it could not have been contemplated by the parties to the contract that the vendors should cause the United States dam to be torn away or lowered; such a stipulation would be impossible to carry out, and would be absurd. The disadvantage, if any, was to be borne by the owner of the water-power, and the vendors could not be taken to have warranted against it. The plaintiffs cited the case of *Kutz* v. *McCune*, 22 Wis. 698.

The plaintiffs contended that the dam was not constructed by them, nor by the improvement company, nor had the improvement company allowed it to be constructed. It had given no sanction or permission to the construction or maintenance of the dam. The improvement company was not bound under its covenant to resist by force the construction of a dam, nor was it a breach of that covenant if the dam had been constructed even by its assent, provided the United States had an equal right to construct it without the assent of the improvement company; citing 6 Barn. & C. 295; 2 Biss. 428, 430.

The United States had constructed this new dam, not by virtue of its rights as grantee of the Fox & Wisconsin Improvement Company, but by virtue of its constitutional authority to improve the navigation of the Fox river in the state of Wisconsin. The dam was constructed only of the same height as the former dam, although in a better manner; and the defendants could claim no damages on account of the injury resulting from the mere improvement of the condition of the dam, so long as the height was not raised. *Cowell* v. *Thayer*, 5 Metc. 253.

It was also claimed that damages should be only nominal, unless facts tantamount to an eviction were shown, the covenant being claimed by the defendants to be in the nature of a warranty, and running with the land.

*W. J. Allen* and *Winfield & A. A. L. Smith*, for plaintiffs.

*Moses Hooper*, for defendants.

DYER, D. J., (*orally.*) The difficulties in the way of maintaining the counter-claims interposed by the defendants seem to be insurmountable. By the contract, dated July 24, 1855, the Fox & Wisconsin River Improvement Company granted to Doty and the Reeds the water-power in question. The corporation, in consideration of that grant, received the real estate mentioned in the contract, the canal by means of which the hydraulic power was supplied not being then completely finished. The improvement company agreed by the same contract to complete the canal in the manner therein prescribed within the time fixed by the charter of the company, which time expired in the year 1856. These are matters which are undisputed. The water-power and property then conveyed to Doty and the Reeds were delivered to them, and they and their successors have ever since had the possession and enjoyment thereof. Some work was done by the improvement company upon the canal in pursuance of the provisions of the contract, and as contemplated by the parties, and it was then turned over to Doty and the Reeds, but not in a fully-completed condition. Up to that time Doty and the Reeds had the right to call upon the improvement company to perform its covenant by making the canal 100 feet wide at the bottom thereof, according to the terms of the contract. But they did not do that; and it appears here from the testimony and as part of the history of the case that Doty and the Reeds regarded the canal as completed. At least they accepted it. They never called upon the Fox & Wisconsin Improvement Company to make the canal 100 feet wide. And admitting that there was a breach of covenant when the time expired within which the canal was to be made of that width, all that Doty and the Reeds thereafter had, if anything, was a right of action against the improvement company to recover damages for their non-fulfillment of that covenant. But it appears that no action of any sort was taken by Doty and the Reeds, either in the form of a claim of damages or to enforce performance of the covenant. They seem to have rested content with the canal as it was, and so it continued in the condition in which it was originally constructed for a period of between 19 and 20 years, and to the time when Doty conveyed to Lawson.

In the light of these facts I think we must regard the covenant in question as extinguished by the acts of Doty and the Reeds, and that

it had no vitality at the time this transfer was made to Lawson. It is part of the history of the case—at least it has so been stated, and the court has accepted it as an undisputed fact—that the property of the Fox & Wisconsin Improvement Company was sold under a mortgage foreclosure; that it was bid off by a third party, who afterwards conveyed it to the Green Bay & Mississippi Canal Company, and that company afterwards conveyed the same to the United States. And I am unable to avoid the conclusion that, when the transfer was made to Lawson, what the parties must necessarily have had in view were such covenants in this contract between the improvement company and Doty and the Reeds as were then in force, and as were then prospective in their character and operation; because it would be absurd to say that Lawson and Doty, when they made their agreement on December 31, 1875, had in mind any covenants or agreements in the contract between the improvement company and Doty and the Reeds, which had become by the acts of the parties, or other cause, extinct. Applying to the case familiar rules of construction, we must, in construing this agreement between Doty and wife and Lawson, take only into consideration such covenants in the contract between the improvement company and Doty and the Reeds as were *in esse* at the time of the transfer to Lawson. And the acts of the parties, the manner in which this canal and water-power were dealt with and were used during the long term of years which elapsed between the making of the contract of 1855 and the conveyance to Lawson, seem to afford conclusive evidence that the covenant to make the canal 100 feet in width was regarded as having no longer any effect. The interests and rights of the improvement company in the property had become extinguished by virtue of the proceedings under which the title became ultimately vested in the United States. These parties were all living at Menasha. The court must presume that they understood the *status* of affairs and the condition of the property; and, construing the contract in the light of all the surroundings and of all the circumstances in which the parties were placed at the time, it seems to me the conclusion is unavoidable that this covenant in the contract between the improvement company and Doty and the Reeds, that this canal should be made 100 feet wide at the bottom, had become extinguished by the lapse of time and the acquiescence of the parties. And, as I have stated, it is not, I think, to be successfully denied that the clause in the Lawson conveyance referring to covenants in the improvement company contract, was intended to cover such things as were yet to be done by the improvement com-

pany. And so, upon the grounds and for the reasons stated, I think the first counter-claim cannot be maintained.

Now, as to the second counter-claim, which has its source in that covenant in the contract between the improvement company and Doty and the Reeds which provides that the party of the first part "will not construct, or allow to be constructed, any dam or other work below on said river which shall raise the water above the ordinary stage at the foot of the rapids at Menasha, aforesaid," as I understand the learned counsel for the defendant, his position is that this covenant is.equivalent in law to such a covenant against incumbrances as is usually incorporated in conveyances of real estate; and he has read to the court various cases in which it has been held that a breach of a covenant against incumbrances occurred where, for example, there was a highway over the land conveyed, and the grantee in the conveyance knew, at the time he took it, that the highway was in existence upon the land. Is this clause equivalent to such a covenant against incumbrances as I have just spoken of; that is, a covenant on the part of the improvement company that there did not exist, and should not in the future exist, a dam or other work below on the river which should raise the water above the ordinary stage at the foot of the rapids at Menasha? I think not. A distinction is to be taken between the covenants on this subject in this contract and an ordinary covenant against incumbrances, which is well understood to be a covenant that relates to the past—relates to what may have been done in the past with reference to the property that is conveyed. The clause which we are considering in this contract is a clause which was intended to cover things which might be done in the future. Its language is, "The party of the first part doth further covenant that it will not construct and will not allow"—that is, will not allow to be constructed—"any dam or other work below on said river."

We find it to be an admitted fact in the case that at the time the contract was made there was a dam in existence on the river below the rapids at Menasha, namely, the dam at Appleton which has been spoken of. That dam was in existence, I say, at the time this contract was made, and it must be presumed that the parties knew that fact, and that they contracted with reference to it at the time. Then we find, further, as I have before remarked, that all the rights and interests of the improvement company passed from it by the mortgage foreclosure; that the Green Bay & Mississippi Canal Company became vested with these rights, and that they were ultimately acquired by the United States. And then the United States, by virtue

of its sovereign power and authority, took charge of this improvement, and, for the purpose of improving the navigation of the river, constructed in place of the old wooden dam, what has been spoken of as the present solid masonry dam, which I understand counsel to concede is of no greater height than the old dam would have been if it had been in a proper state of repair; so that we have a case where, at the time the contract of 1855 was made, the parties to it on both sides knew that a dam was then in existence across the river. The proofs show that Lawson was long a resident of Menasha. He made this contract with Doty and wife in December, 1875, and at that time the government dam had been constructed. Now can it be said, in the first place, that Lawson was in a position, after he made this contract with Doty, to complain of the existence of that dam at Appleton? And, in the second place, can it be said that the Wisconsin Improvement Company, within the language and meaning of this contract, allowed the dam to be constructed? It seems to me that both of these questions must be answered in the negative. In defining the word "allow," as it is used in that contract, we must take it in its ordinary and popular sense, and there is quite clearly implied in the use of that word the understanding or expectation of the parties at the time that the improvement company would continue in such relation to the property that it might, if so disposed, by some affirmative act on its part, facilitate or permit the construction of a dam below the rapids, and this it was intended by the contract to prevent. The word "allow," in its ordinary sense, means "to grant," "to admit," "to afford," or "to yield," "to grant license to," "to permit;" from which is implied a power to grant some privilege or permission.

No argument is needed to show that the Fox & Wisconsin Improvement Company was not in a position to do any such thing as that when the government entered upon this enterprise and rebuilt this dam. The improvement company was in a position where it could prevent nothing; it could suffer nothing. The United States could proceed in the construction of this dam independently of the improvement company, without its consent, against its protest. And I think it must have been in the contemplation of the parties to the contract of 1855, at that time, that the Fox & Wisconsin Improvement Company would continue in its relations to the property as then existing, and that it was intended by the contract to deprive it of the right, by any affirmative act on its part while exercising authority and control over the improvement, to allow a dam to be constructed which should raise the water above the ordinary stage at

the foot of the rapids. It is true, as suggested by Mr. Hooper, that the question of the powers and rights of the United States with reference to this property is a grave one, and for a correct solution of it in all its bearings much more consideration may be needed than we are able to give to it now. But at present I am not able to see how the argument is to be met, that when the United States stepped in and acquired dominion and control over this property for the purpose of improving navigation, it had the right by virtue of its sovereign power—so far, at least, as the interests of the parties now before the court are concerned—to build the Appleton dam; and I do not see how that act of the government can be regarded as one covenanted against by the Fox & Wisconsin Improvement Company when that company made its contract of 1855 with Doty and the Reeds.

These are at present my views upon the questions here presented, and it results that in the opinion of the court the second counterclaim is not maintainable.