# Richmond

## J. T. McDiarmid v. Commonwealth of Virginia.

November 19, 1945.

Record No. 3004.

Present, All the Justices.

The opinion states the case.

*Jones & Jones* and *K. L. Woody*, for the plaintiff in error.

*Abram P. Staples, Attorney General,* and *V. P. Randolph, Jr., Assistant Attorney General,* for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

This writ of error brings under review a judgment of conviction of the Circuit Court of the city of Hopewell, pronounced against the defendant, J. T. McDiarmid, for a violation of section 4675 (41) of Michie's Code, 1942.

The Code section of the Alcoholic Beverage Control Act provides, *inter alia:*

"If any person who holds a license issued under the provisions of this act, * * * (g) Shall keep or *allow* to be kept other than in his residence and for his personal use, any alcoholic beverages other than that which he is authorized to sell by such license or by this act, * * * * he shall be guilty of a misdemeanor and shall be punished as is provided in section 4675 (62), * * * ." (Italics supplied.)

Upon his arraignment, the defendant entered a plea of not guilty, and having waived trial by a jury, all matters of law and fact were submitted to the trial judge, who, at the conclusion of the evidence of the Commonwealth and the defendant, found the defendant guilty of violating section 4675 (41) of the Code, and fixed his punishment at a fine of $50.00 and costs.

There is no material conflict in the evidence.

On the 10th day of November, 1944, the defendant, J. T. McDiarmid, a white man, owned two night clubs, one of

which was the Harlem Night Club, managed by Frank McCants, a Negro, which catered to colored trade only; the other, The Ritz, catered to white trade only, and was operated by the defendant in person, requiring all of the defendant's time.

The actual operation of the Harlem club is and has been conducted in the following manner: The club is operated for the entertainment of Negroes. It is a restaurant at which wine and beer are sold both on and off the premises. The defendant some years ago, at the suggestion and upon the recommendation of the inspectors of the Alcoholic Beverage Control Board, employed Frank McCants as general manager and supervisor of this club. He is paid $100.00 per month salary, plus commissions on sales, which sometimes amount to as much as $80.00 a month. Out of this salary and commissions Frank McCants hires and pays what help he may find is needed in the operation of the restaurant and club.

McCants employed one Melvin Chisholm as a part-time man around the club. Chisholm's duties were principally to clean up the restaurant and do odd jobs around the place.

On the 10th day of November, 1944, the ABC inspectors, together with C. R. Collier, a member of the local police force, raided the Harlem Night Club and found a pint bottle about half full of what is known as "Family Club" whisky, purchased in the District of Columbia, belonging to Frank McCants, and two unopened fifths of "Three Feathers" whisky, purchased at the local ABC store, belonging to Melvin Chisholm, Frank McCants' helper. The ownership of the whisky was admitted by each of these parties. Frank McCants was arrested, tried and convicted for the unlawful possession of said whisky on the premises.

It is not contended in the trial court that McDiarmid, the defendant in this case, was at or near the premises when the whisky was found, nor was it shown in the evidence that he had been there for several days prior thereto.

The action of the trial court in finding the defendant guilty is assigned as error.

The sole question presented is one of law, viz., whether a licensee, under the Alcoholic Beverage Control Act, section 4675 (41), is criminally liable for the acts of his manager and his employee in keeping liquor on the premises of the Harlem Club without the defendant's knowledge and acquiescence.

It is conceded by the Assistant Attorney General that in the ordinary course of criminal law the doctrine of *respondeat superior* has no application. However, it is contended by the Commonwealth that, in the conduct of a business involving the sale of spirituous liquors under a license granted by the A. B. C. board, the doctrine of *respondeat superior* does apply, and that the person who holds the license is criminally liable if he allows to be kept on the premises any alcoholic beverages other than those he is authorized to sell under such license.

In support of this contention, *O'Donnell v. Commonwealth*, 108 Va. 882, 62 S. E. 373, is relied upon.

The facts in that case are: O'Donnell had a license to sell liquor by retail in the town of Harrisonburg, Virginia. One of his clerks, on the 26th day of May, 1908, sold to one J. L. Sherrard one-half pint of whisky, knowing the said Sherrard to be intoxicated, in violation of the "Byrd Liquor Law" (Acts 1908, p. 275), which interdicted the sale of ardent spirits to "any intoxicated person."

In holding that the doctrine of *respondeat superior* did apply, Judge Cardwell said: " * * * in the case at bar, it was not questioned that the liquor sold was the property of the defendant; that the clerk who sold it was the agent of the defendant and as such authorized to sell the liquor according to law; nor is it pretended that the defendant did not get the money paid for the liquor. * * * It is wholly immaterial, under the positive prohibition and policy of the statute, what the instructions were from the defendant to his clerk, or that the sale was in violation of his instructions. Neither the motives nor the intent of the defendant, nor his purpose to obey the law, can relieve him, when it is shown that a sale in violation of the statute was actually and pur-

posely made either by himself or by another for him. The clerk knew he was selling the liquor, and the proof shows that he was selling it as the agent of and for the defendant. If the purpose had been to sell a wholly different thing from that which was in fact sold, an article the sale of which was not prohibited, then the motive and intent might be material."

In our opinion, the *O'Donnell Case, supra,* is not in point, for the reason that the facts are different and the applicable statutes are wholly different. In the case at bar, it is conclusively shown that the liquor found in the Harlem Club was not the property of the defendant; that the employees did not bring the liquor upon the premises with his knowledge and acquiescence; that the liquor was not a product which could be sold under the license granted; that, in fact, no liquor was sold and no advantage whatever redounded to the defendant by the presence of the liquor upon the premises.

The statute construed in the *O'Donnell Case, supra,* provided that "no person * * * shall knowingly sell (ardent spirits) to any intoxicated person." The basis of the decision is that since it was the duty of the agent to sell liquor, therefore his act was the act of the master, and hence the doctrine of *respondeat superior* was applicable.

The statute involved in the case at bar merely provides that it shall be a violation of the statute for the licensee to "keep or allow to be kept," other than in his residence, alcoholic beverages, etc.

As there is not a *scintilla* of evidence that the defendant kept liquor upon the premises, the case turns upon an interpretation of the language in the statute "or allow to be kept." ▉ ▉ Under the time-honored rule applicable to criminal statutes, there is no such offense as a violation of a criminal statute by implication. Under a proper construction of the statute, did the defendant "allow" the liquor found in the Harlem Club to be so kept there as to make him amenable to the doctrine of *respondeat superior?* In our opinion the question must be answered in the negative.

The word "allow" has a very definite meaning.

In Bouvier's Law Dictionary it is defined thus: "To permit, consent to, or approve * * ."

In Words and Phrases (2nd), Vol. 1, p. 194, we read: "To allow a thing to be done is to acquiesce in or tolerate, knowledge, express or implied, being essential. *Sawyer* v. *Mould*, 144 Iowa 185, 122 N. W. 813, 25 L. R. A. (N. S.) 602. Hypothesis that a locomotive engineer 'allowed' the water to get below the crown sheet of a locomotive boiler implies knowledge on his part. *Houston, etc., R. Co.* v. *Haberlin*, 58 Tex. Civ. App. 375, 125 S. W. 107."

In *Doty* v. *Lawson*, 14 F. 892, the court had under consideration the question of the erection by the United States of a dam injuriously affecting a water power conveyed by an instrument in which it is covenanted that the corporation from which the seller acquired the property "should not construct, or allow to be constructed, a dam or other improvement" below such water power to its injury.

In the contract under review appears the key word "allow." In the opinion this is said: "In defining the word 'allow,' as it is used in that contract, we must take it in its ordinary and popular sense, and there is quite clearly implied in the use of that word the understanding or expectation of the parties at the time that the improvement company would continue in such relation to the property that it might, if so disposed, by some affirmative act on its part, facilitate or permit the construction of a dam below the rapids, and this it was intended by the contract to prevent. The word 'allow,' in its ordinary sense, means 'to grant,' 'to admit,' 'to afford,' or 'to yield,' 'to grant license to,' 'to permit;' from which is implied a power to grant some privilege or permission."

The judgment of the trial court is without evidence to support it and, therefore, it will be reversed and annulled.

*Reversed.*